Filed 11/14/25  Estate of McMahon CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| Estate of DAVID J. McMAHON, Deceased._____ | |
| VICTORIA BOYKO, | |
| Plaintiff and Appellant, | A170449 |
| v. | |
| KIM SCHWARCZ, as Personal Representative, etc., | (San Francisco City & County Super. Ct. No. CGC-18-569795) |
| Objector and Respondent. | |

In this action for unpaid wages, Victoria Boyko appeals from an adverse judgment following a jury trial.  She raises numerous claims of error, most supported by four juror declarations obtained after trial.  Specifically, she argues substantial evidence supported her claimed damages and thus the jury's failure to award her any damages must be reversed, the trial court abused its discretion in denying her motion for new trial on the ground of juror misconduct, and the trial court invaded the province of the jury by making a credibility finding against her when denying her claim for restitution under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)).  We affirm.

1

## BACKGROUND

David McMahon was an attorney who specialized in performing legal audits—that is, he reviewed attorneys' fees for insurance companies and other individuals and entities to make sure they were reasonable and necessary, and the client was not overpaying. He also testified as an expert witness as to the reasonableness of fees. To perform this work, McMahon was required to generate detailed audits of the billing records at issue.

In January 2016, McMahon left his partnership with a law firm and went into business for himself, focusing on his legal audit work. He enlisted the services of Boyko, his former legal assistant, Bogdan Viner, Boyko's life partner who had a background in IT, and Esfir Viner, Bogdan's sister who had a background in accounting.[1] After working together successfully for slightly over a year, McMahon's relationships with the three soured, and they ceased working for him.

In September 2018, Boyko filed a complaint against McMahon, alleging, as is relevant here, causes of action for unpaid wages (Lab. Code, § 204), waiting time penalties (*id.*, § 203), unfair business practices under the UCL, and quantum meruit. In addition, Boyko alleged an implied-in-fact contract with McMahon pursuant to which she could be fired only for cause and would receive wages in the amount billed to clients for her legal auditing services for 10 years, at which point, she would take over the legal auditing business, with McMahon only doing marketing for the company. She also sought attorney fees (Lab. Code, § 218.5) and interest (*id.*, § 218.6). Bogdan and Esfir filed similar complaints in April 2019 and November 2018, respectively.

---

[1] We will refer to the Viner siblings by their first names to avoid confusion.

In 2020, McMahon unexpectedly passed away.  The probate court appointed Kim Schwarcz, a professional fiduciary, as personal representative of the estate.  Thereafter, Schwarcz was substituted into all three cases as the defendant.  The three matters were ultimately consolidated for trial.[2]

***Summary of Trial and Related Proceedings***

Jury trial took place over the course of seven days in July 2023.  The evidence adduced included the following:

***Testimony of Victoria Boyko***

Boyko was born in Ukraine and, while a child, emigrated to San Francisco with her family.  She graduated from college with a degree in finance and subsequently worked various office jobs, including as a finance manager and an accounting manager.

She met McMahon in 2013, when he offered her a job as an assistant at the law firm where he was a partner.  Boyko was eventually hired as an independent contractor to help McMahon with his legal audits.  Thereafter, the law firm merged with another firm.  Boyko continued to work for McMahon.  Among other tasks, she created marketing brochures at McMahon's request which introduced McMahon and Boyko as the firm's audit team.

During this timeframe, McMahon also recruited Bogdan, Boyko's long-term partner, to assist with his legal audit work.

Throughout 2015, McMahon spoke with Boyko about wanting to start his own company so he would have more control over his legal auditing business and less overhead.  According to Boyko, McMahon wanted to create

---

[2] On our own motion we take judicial notice of the appellate record in each of the other two cases tried with Boyko's case—No. A170193 (Esfir) and No. A170254 (Bogdan).  (Evid. Code, §§ 452, subds. (c) & (d), 459, subd. (a).)

two entities—a law firm for his litigation work and a company for his legal audit work.  As to the legal audit business, "he was looking for a partner to do the audits with and to support him in his audits."  According to Boyko, the idea was that she and McMahon would be 50/50 partners in the audit business (which was approximately 90 percent of McMahon's total work).  As to the general litigation legal work (i.e., the remaining 10 percent of McMahon's work), Boyko would act as office manager, and when she assisted him as a paralegal, she would be paid by the hour.  McMahon spoke of retiring in 10 years, at which time she would take over the audit business, with McMahon continuing to do marketing for the company.  While McMahon filed papers with the Secretary of State and opened a bank account for the audit business (Fulcrum Litigation Management), he never prepared a written partnership agreement or fully utilized Fulcrum.

Around Christmastime, McMahon treated Boyko, Bogdan, and Esfir to a celebratory dinner at which McMahon stated he was ready to open a new company, with Bogdan doing IT and Esfir doing bookkeeping and accounting.

Early on, they had a meeting where McMahon explained they would not be paid immediately because clients often took 90 days or even more to pay for services.  McMahon told Esfir she would be paid at market rate for her accounting services.  An e-mail from McMahon was admitted into evidence confirming that Bogdan's rate of pay for IT services was $140 per hour.  A document was admitted into evidence showing McMahon's billing rate of $450 per hour.  No similar evidence was presented as to Bogdan's, Esfir's, or Boyko's rate of pay per hour for legal auditing services.

Boyko would sit in on meetings with audit clients and would be introduced to them either as McMahon Law's audit director or partner.  Boyko did not know at the time that she could not be a partner in a law firm

4

because she was not a lawyer. With respect to the audit work, all her discussions with McMahon were partnership based, and the work was supposed to be conducted by a different entity than his litigation work.

The audits could be very complex. Boyko recalled one involving 25 million dollars of legal fees over the course of 10 years which included 18 different law firms, as well as related vendors and expenses.

After McMahon was hired to conduct an audit, Bogdan would take the digital files and "data map[]" them so that they could be merged into McMahon's proprietary audit software, which could read them and create reports. While this was being done, Boyko and McMahon went through a paper version of the files and assigned every entry on every invoice a specific code by hand. Boyko would then, under McMahon's supervision, enter the codes for each item into the audit software.

Although Boyko was hired to supervise staff and be McMahon's point person, she could not make a move without McMahon's instructions or authority. She never went to the bank without McMahon's authorization, and he usually accompanied her. McMahon would review all invoices before Boyko was allowed to authorize Esfir to pay them. She had to get permission from McMahon to contact clients.

The group used several offices. One was in the home shared by Boyko, Bogdan, their children, and Esfir, where McMahon had his own space and computer. Another was in the basement of a house McMahon owned in Mill Valley which was otherwise rented to tenants. A third was located in the home where McMahon lived with his wife. The fourth was a traditional office space with a conference room McMahon rented in San Francisco.

5

Boyko worked approximately 60 to 70 hours in a typical week and would work evenings and weekends as needed. She kept timesheets reflecting the billable hours she worked on audit cases.

Boyko was paid infrequently because McMahon would only pay her after a client paid. Even then, he only paid Boyko for a portion of her work.

Boyko prepared a printout of all wages McMahon paid her, which was admitted into evidence. From April to July 2016, she received payments totaling approximately $200,000. She received payments in the same range in 2017. However, according to Boyko, the approximately $140,000 she was paid in February 2017 was due to the fact she had asked McMahon in January to start paying her what she was already owed and to prepare the partnership documents. McMahon said he would get back to her with respect to the partnership documents. But after that, her assignments and communications between the two started to decline.

After she received the February payment, McMahon asked to meet about the partnership. At a meeting on February 15, the two discussed the goals of the audit business and their positive working relationship. McMahon apologized for his previous actions and stated he wanted to continue the business. They made plans to meet two days later at the San Francisco office to go over an expert report that was being prepared for a client. McMahon said he would bring a written partnership agreement at that time.

On the morning of the scheduled meeting, McMahon called Boyko, crying and asking her not to leave him. At the time, she took this to mean that he did not want her to leave the business, as he had recently told her his wife had left him. When Boyko got to the meeting, however, McMahon proposed they not only work together but "be together" romantically. Boyko

6

was shocked. She told him he needed to get himself together and that was not what their relationship was about. Then she left.

Boyko worked on her own on a client audit through February but then did no more work for McMahon.

Boyko created records of the time she worked in December 2016, January 2017, and February 2017. Her time was billed out to clients at $250 an hour, which was sometimes discounted to $210 if the client was given a discount. McMahon told her that her client billing rate would also be her pay rate.

According to Boyko, she was owed $140,000. Although she believed she was entitled to share in the profits of the company, she did not think she could ask McMahon for a 50/50 share because there was no written partnership agreement.

The following month, in March, McMahon texted Boyko, apologizing and saying he hoped they could be friends and get back to their business relationship. Although she did not see him in person, she heard from him by text throughout the month, and by e-mail even after that.

Boyko did not have a clear understanding of when her employment ended, but hypothesized it was in September. She was on vacation from March through May. By May, she had heard McMahon was refusing to pay people, but she continued to receive e-mails from him about twice a month on work matters. She still had access to McMahon Law e-mail and documents.

### *Testimony of Bogdan Viner*

Bogdan was born in Latvia and came to the United States when he was 16, where he received an associate's degree in computer science. He met McMahon through Boyko, and the two subsequently became friends. At some

point, McMahon told him he was looking for help on some projects, with the idea of eventually starting his own company.

Bogdan then did some legal auditing work for McMahon, before McMahon left his law firm to go out on his own. Bogdan did the work at his home or at the firm's offices in the evenings. He was paid for this work through A2Z, an LLC Bogdan created two years before meeting McMahon. Bogdan intended to use the entity for real estate sales but never did. McMahon and Bogdan used A2Z so McMahon could present Bogdan "as his legal auditor who, as a company, would do legal audits on his behalf."

McMahon prepared an invoice from A2Z for this initial project in the amount of $81,750, which was admitted into evidence and reflected both Bogdan's hours and the hours of others. McMahon also prepared a second invoice for this project, but Bogdan could not remember the amount of that invoice. The understanding between the two men was, when the client paid, they would split the payment 30 percent to Bogdan and 70 percent to McMahon. A check for $123,100 payable to A2Z was admitted into evidence representing the total the client paid for the project. A cashier's check for $102,026.80 from A2Z to McMahon was entered into evidence, and Bogdan testified it represented McMahon's 70 percent share.

After they concluded this trial project to see if they worked well together, McMahon decided to go out on his own. They had a celebratory dinner at the end of 2015 at which McMahon, Boyko, Bogdan, and Esfir were present. At the dinner, McMahon indicated he wanted Bogdan to be his IT specialist and continue to do legal audits. Boyko was to be his partner in Fulcrum Litigation Management. Esfir was asked to do accounting and possibly some legal auditing, but she could only work part time because she already had a full-time job.

8

McMahon told Bogdan he would be paid 100 percent of whatever negotiated hourly rate was charged for his time on a legal audit project. Their agreement was not in writing, but Bogdan did receive an e-mail from McMahon stating he would be paid $140 per hour for his IT work. There was also nothing in writing for the first audit representing an agreement as to Bogdan's hourly rate of pay. Every legal audit was customized, and McMahon would sit next to Bogdan, training and supervising him in using the methodology McMahon had created for each specific audit. Bogdan did the work at his home office for subsequent projects and continued to be paid through A2Z. Bogdan kept his time in six-minute increments on his computer, printing it off monthly to give it to McMahon. McMahon would prepare invoices for clients after gathering everyone's timesheets. He would make calculations and then give them to Esfir to add to the invoice. A2Z was paid $263,749.74 by McMahon Law in 2016.

Bogdan worked on a legal audit in November and December 2016 for which he was never paid. Bogdan was also not paid for a legal audit he worked on from November 2016 through January 2017. McMahon had agreed to pay him $175 per hour for both projects.

Bogdan's home computer where he kept his timesheets was subsequently destroyed by a power surge.

### Testimony of Esfir Viner

Esfir came to the United States from Latvia at a young age. She eventually earned a college degree in accounting and worked as a full-time accountant.

Esfir confirmed that an electrical surge had impacted their home computer and many different electrical appliances in the house in May 2018.

9

She made a claim to PG&E for the damage. All her individual timesheets stored on the home computer were lost.

Esfir first helped McMahon on a legal audit when he was with his prior firm in October 2015. That same month, he told Esfir he would like her to do accounting and bookkeeping work for him if he opened his own firm. At the time, she already had a full-time accounting job, so she told him she would have to be part time. He told her he would research the market rate for her position, so he could pay her that.

At a celebratory dinner in December 2015, McMahon told Esfir she was qualified to work on legal audits, and he wanted her as part of his team. He explained to the group that he thought they worked well together, and he was going to open his own firm. McMahon reiterated to Esfir that he wanted her to do part-time bookkeeping for him and that he was going to research what a reasonable part-time rate would be. He additionally told her she might also work on legal audits, and the amount she would be paid for that would be the amount he billed to his clients for her work.

Esfir started doing bookkeeping and accounting work for McMahon in January 2016. She followed McMahon's instructions when completing all her accounting work. She never wrote a check or did a distribution without McMahon's express authorization.

Esfir kept track of the approximate number of hours she worked during the first three months of 2016, which were about 35 hours per month. She told McMahon this number so he could investigate comparable pay rates. Esfir did not otherwise keep track of her monthly accounting hours, but they remained the same. In May 2016, McMahon agreed to pay her $3,000 per month for her accounting work. She was paid for the months of June 2016 through January 2017.

At McMahon's request, Esfir prepared an invoice for what she was owed for accounting for January through May 2016. The invoice, which was entered into evidence, reflected she was owed $15,000. McMahon told Esfir payment of the invoice would be deferred until the end of the year for cash flow purposes. She was never paid. Esfir received an e-mail in January 2017 from McMahon stating he was going to transition her away from the accounting work in favor of his tax accountants.

McMahon used a cash-based accounting software for the business. Esfir never entered data into the accounting software unless she was instructed to do so by McMahon. The software did not include what was owed or paid to employees, independent contractors, or vendors.

Esfir was involved in the creation of client invoices for McMahon from January 2016 through January 2017. She, Bogdan, and Boyko would provide their timesheets to McMahon. He would approve them and then use them, along with his e-mails and phone calls, to create his own time records. McMahon would then provide the data to Esfir, and she would input the date, description, and hours into an invoice template. Esfir would then print out a draft, which McMahon would revise. Once McMahon approved a final version, Boyko would convert it to a pdf and send it to the client. After an invoice was sent to the client, Esfir would input all the data into the accounting software. She also checked that the hours on the invoice for everyone matched the timesheets she had received. It typically took approximately 90 days for clients to pay their invoices. An income statement for McMahon Law for 2016 was admitted and showed net income of approximately $1,500,000 for the firm.

Esfir began working on legal audits for McMahon in November 2016. She calculated what she was owed for these services (as opposed to

11

bookkeeping) to two clients by adding up all her hours listed on relevant McMahon client invoices. The invoice for January 2017 (prepared in February 2017) was a draft because she never received the final. Whenever she inputted the data from the final invoice sent to a client, she also compared the hours listed for everyone on their approved timesheets, and there was never any deviation. The invoices reflected her pay rate of $175 and the total number of hours she worked. She could not say how many hours she worked on any particular day because McMahon would reallocate hours. She was never paid for this legal auditing work.

### *Verdicts*

As to Boyko, the jury found no partnership had been formed with McMahon. It also found facts establishing that Boyko was an employee of McMahon Law, rather than an independent contractor; that she performed work for McMahon; and that McMahon owed her wages. However, the jury also found Boyko failed to prove the *amount* of wages she was owed and also failed to prove the *value* of the services she provided for purposes of quantum meruit. It specifically found Boyko failed to prove an implied-in-fact contract to pay her wages in the amount billed to clients. The jury therefore awarded her no damages.

In contrast, the jury awarded Esfir $95,515 in unpaid wages for auditing work and determined her daily rate of pay at the end of her employment was $634.51. It also awarded Esfir $15,000 in unpaid wages for her accounting work. The jury similarly awarded Bogdan $94,832.50 in unpaid wages and determined his daily rate of pay at the end of his employment was $637.90.

12

### *UCL Claims*

After the jury returned its verdicts, the trial court considered the parties' briefing and arguments on their UCL claims.  The court pronounced its decision on the record in mid-November, and subsequently filed a statement of decision, wherein it noted a judge cannot ordinarily " 'ignore the jury's verdict and grant equitable relief inconsistent with the jury's findings' " and that a UCL claimant may only obtain injunctive relief or restitution.  It additionally observed a court has wide discretion whether to grant relief even when an unfair business practice has been shown.

As to Boyko, the court found McMahon had engaged in an unfair business practice by mischaracterizing her as an independent contractor.  But it also found "Boyko was not a credible witness as to her claim of partnership with McMahon and as to her rate of pay.  The court is not persuaded by Boyko's testimony that McMahon agreed to pay her 100% of the rate McMahon billed his clients for her work (i.e., a 100% 'pass-through' rate).  The court finds Boyko's testimony in this regard to be in conflict with her other testimony where she claimed to be a 50/50 general partner which would have imposed upon her half of the overhead and other liabilities of the business.  The court also finds Boyko's testimony of a pass-through rate inconsistent with other testimony and evidence about the methods used by McMahon to run his business."  Thus, with respect to restitution under the UCL, the court found Boyko failed to prove she was harmed, the amount of any harm, or that McMahon was unjustly enriched, and that the amount already paid by McMahon to Boyko (over $400,000) was more than equitable.

In contrast, the court found Esfir and Bogdan were entitled to restitution but wholly offset the amounts " 'dollar for dollar' " by the amounts awarded by the jury as owed wages.

13

### *Post-Trial Motions and Judgment*

The court entered judgment against Boyko on December 28, 2023.

The following month, in January 2024, she moved for a new trial on damages and restitution. Relying on declarations obtained from four of the jurors, she argued she was entitled to a new trial because the jurors felt time pressure in rendering their verdicts, found the special verdict form confusing, and were confused by the instructions and verdict form with respect to quantum meruit. She also claimed the jury improperly compared the evidence among the three separate cases and incorrectly assumed the judge would award damages if they did not. After briefing and argument, the court denied her motion.

## DISCUSSION

### *Admissibility of Juror Declarations*

As she did in the trial court, Boyko relies on the four juror declarations she solicited after the verdicts to support her arguments on appeal. Schwarcz's lead argument in response is that the declarations are inadmissible under Evidence Code section 1150. Boyko claims Schwarcz forfeited this argument by failing to object to the declarations in the trial court. As we shall explain, given the state of the record, we decline to find forfeiture.

Pursuant to Evidence Code section 1150, subdivision (a): "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror

14

either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

As our high court has explained, " '[t]his statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved. . . ." [Citation.] "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281.)

Juror statements " 'must be admitted with caution,' because '[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 484 (*Cleveland*).) "[S]tatements made by jurors during deliberations are admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct.' " (*Ibid.*) In contrast, "when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 (*Hedgecock*).) Indeed, " '[e]vidence that violates Evidence Code section 1150 is not merely inadmissible; it is irrelevant—"of no jural consequence." ' " (*In re Hansen* (2014) 227 Cal.App.4th 906, 928–929.)

The juror declarations at issue here were first presented to the trial court in conjunction with Boyko's postverdict briefing on her UCL claim. In

15

her written opposition, Schwarcz characterized Boyko's UCL claim as one "purportedly supported by juror declarations," but she did not specifically object to the declarations.

A subsequent minute order of a hearing on October 19 indicated Boyko's (and Esfir's and Bogdan's) UCL claims were ready for resolution, gave a tentative ruling, and set a briefing schedule for additional briefing on those motions.

In her supplemental briefing, Schwarcz did not mention the juror declarations. But she did note that, at the hearing, the trial court had indicated Boyko's argument for a new trial was not "procedurally proper" at that point.

The minute order for the continued hearing on November 15, states the parties argued the UCL issues and as to Boyko, the court ruled she was not entitled to restitution.

Thereafter, Boyko resubmitted the juror declarations in support of her new trial motion. In her written opposition, Schwarcz argued the motion should be denied on multiple grounds, including that the juror declarations were "insufficient to form the basis of a new trial motion for any reason." She went on to argue why the statements in the declarations failed to support the grant of a new trial.

It is not clear from the minute order for the new trial hearing on March 1, 2024, whether there was argument on Boyko's new trial motion, or whether the motion was simply submitted. It is clear, however, there was argument with respect to Schwarcz's new trial and JNOV motions. The court then denied all three motions, stating: "A proper showing has not been made that the Court should disrupt the verdict."

16

While it may be that Schwarcz failed to voice any objection to the juror declarations on the basis of Evidence Code section 1150, the record does not definitively demonstrate that is the case. The record on appeal contains no reporter's transcript of the hearings on either the UCL claims or new trial motions. Nor have the parties provided settled statements. (See Cal. Rules of Court, rule 8.137.) Moreover, as we have recited, Schwarcz argued in her written opposition that Boyko's new trial motion should be denied because the juror declarations were "insufficient to form the basis of a new trial motion for any reason." And, in denying Boyko's new trial motion, the court ruled no "proper showing" had been made to "disrupt the verdict." In short, the state of the record as to the evidentiary propriety of the juror declarations is at least arguably ambiguous—and, thus, not one on which we are prepared to find forfeiture of what is essentially a legal issue on the application of Evidence Code section 1150, which the parties have fully briefed on appeal.

### Substantial Evidence of Rate of Pay

Boyko maintains the jury erred in failing to award her damages because it assertedly made findings *entitling* her to a damages award and she presented substantial evidence supporting the *amount* of damages she claimed.

" 'We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) However, where, as here, the issue involves a failure of proof, the reviewing court must consider " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Id.* at p. 466.) In such case, the court should ask " 'whether the appellant's evidence was (1) "uncontradicted and

17

unimpeached" and (2) "of such character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*)

Boyko first relies on the well-established principle that "unless the testimony is physically impossible or inherently improbable, [the] testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) In this regard, she points to her own testimony regarding the extent of, and payment arrangements for, her work and that she was owed over $567,000 for it. Her testimony, she asserts, was not "physically impossible or inherently improbable." And in support of this assertion she relies on three of the four juror declarations stating jurors found her credible and thought she was entitled to damages.

Boyko admits, however, as she must, that "[a] trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so. (See *Blank v. Coffin* (1942) 20 Cal.2d 457, 461 . . . ; see also *Guerra v. Balestrieri* (1954) 127 Cal.App.2d 511, 515 . . . ['the trier of the facts is not required to believe everything that a witness says even if uncontradicted'].)" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.)

As for her reliance on the three juror declarations stating the jurors found her credible and thought she was entitled to damages, these are precisely the kind of postverdict juror statements inadmissible under Evidence Code section 1150—they are verbal reflections of the jurors' mental processes and, as such, cannot be used to impeach the jury's verdict after-the-fact. (See *Hedgecock, supra*, 51 Cal.3d at p. 419.)

In any case, the declarations do not foreclose the possibility that, even if jurors found Boyko generally credible and concluded she had not been paid for all of her work, it found her evidence as to the *amount* of her claimed damages so contradictory and confusing it was unable to determine, with any

18

degree of confidence, the amount of such damages. Boyko testified she was entitled to a 50/50 share of the profits with respect to McMahon's legal audit business and she should be paid based on the number of hours she billed to the audit clients. She also claimed McMahon told her he would pay her a 100 percent pass-through rate for all the hours she billed clients. She admittedly did not record her hours for the time she spent managing the business for McMahon. And although she had been paid over $400,000 for her work, she presented no evidence as to how these lump sum payments were calculated or the type of work they were for. We certainly cannot say on this record that, as a matter of law, the evidence compelled a finding in favor of Boyko with respect to the *amount* she was assertedly owed.

Indeed, even taking into account the declarations, they support, rather than undermine, this conclusion. The declarations all reflect statements that jurors were uncomfortable relying on Boyko's testimony, alone, regarding the amount of her damages, even though the testimony was not challenged. They wanted to see hard evidence. Jurors also indicated they did not understand the amount of damages Boyko was requesting, as she had both billable audit work and unpaid time managing the law firm. Jurors "agreed [they] could not award damages for unpaid wages without understanding what the amount was tied to." The jury foreman declared: "All of the jurors voiced their agreement that the dollar amount requested by Ms. Boyko's lawyers seemed speculative because there was no delineation of which of her duties the dollar amount applied."[3]

---

[3] Indeed, as Boyko, herself, states in her briefing, she "performed a tripartite quantity of services—1) office manager; 2) legal audit work under the auspices of the never-formed partnership; and 3) work on client billed matters for non-audit clients. On top of all that, [she] made herself available

19

In sum, the jurors' failure to find any *amount* of damages was not juror error; it was a failure of proof. By positing an array of theories of recovery, without ever describing the exact damages she was seeking, Boyko failed to marshal sufficient evidence to support any non-speculative award.

Boyko next relies on the proposition that damage *estimates* are permissible in a case such as this one where records were unavailable, and the jury was instructed on this point. (See *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269 [" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.' "].) In support, she again points to the juror declarations, specifically to statements that the jury did not estimate damages because it was not given a choice to do so under the special verdict form or instructions pertinent thereto.

Boyko did not, however, object to the special verdict form before the jury was discharged and therefore forfeited any challenge to it. In fact, the special verdict form appears to have been crafted collaboratively by the parties and the court. It is well established that " '[f]ailure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263–264 (*Keener*), italics omitted.) For example, in *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, the instructions on

_____

at all hours of the day and provided office space to McMahon at her home without charging rent."

20

the special verdict form incorrectly told the jury to skip two questions about a hostile work environment sexual harassment cause of action. (*Id.* at pp. 1240–1241.) The defendant had not detected the error when it approved the verdict form. (*Id.* at pp. 1241–1242.) The appellate court affirmed the trial court's ruling that the defendant forfeited any claim that the special verdict was fatally defective because it failed to object before the jury was discharged. (*Id.* at p. 1242.)

So too, here. The jury delivered a complete verdict, consistent with the instructions given. Thus, Boyko's objection is to the form of the verdict and the issues determined by the verdict. Since she failed to object in a timely manner, she has forfeited her claim. (See *Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 616–617.)

Moreover, her argument is based squarely on inadmissible juror declaration statements. These statements include that "[e]stimating Ms. Boyko's unpaid wages was mentioned, but we agreed that we could not make an estimate because the verdict form did not give us the option to do so. Once we voted 'No' to Question 12, which asked whether she proved the amount of wages owed at an agreed rate of pay for work performed, the form instructed us to skip Question 13 asking about the amount, and other questions, until we got to Question 26." Again, these statements are consummate examples of verbal reflections of the jurors' mental processes inadmissible under Evidence Code section 1150. (See *Hedgecock, supra*, 51 Cal.3d at p. 419.)

Boyko also argues the jury did not understand her quantum meruit damages claim. This argument suffers from the same deficiencies as her second. To the extent she is asserting there was a flaw in the special verdict form and pertinent instructions, Boyko forfeited the argument by failing to object to the verdict in a timely manner. (See *Keener, supra*, 46 Cal.4th at

pp. 263–264.) She is also basing her claim on the following statements in the juror declarations: "The jurors talked about the meaning of 'quantum meruit,' and most, if not all of us said we did not understand what the term meant. The definition of this term was not provided during the verbally stated jury instructions. When the court did not answer our question about its meaning and referred us back to the written jury instructions, we reread the instructions, but we continued to agree that the meaning of quantum meruit was not clear. Because of that we agreed that we did not know how to answer the question whether Ms. Boyko had proven the value of her services to David McMahon, and we voted to say 'No' to the question on her verdict form." These statements are, like the others on which she has relied, verbal reflections of the juror's mental processes and inadmissible under Evidence Code section 1150. (See *Hedgecock*, *supra*, 51 Cal.3d at p. 419.)

Finally, Boyko relies on the principle that a " 'plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon [him or her]' " because " 'failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages.' " (*Elation Systems, Inc. v. Fenn Bridge LLC* (2021) 71 Cal.App.5th 958, 965–966; see Civ. Code, § 3360 ["When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."]; *Elations Systems, Inc.*, at pp. 965–966 [where the jury found the defendant breached a nondisclosure agreement but the plaintiff did not suffer damage, the plaintiff could still recover nominal damages]; *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632–633 [where the defendant breached

a contract to develop real property but the plaintiff's damages were speculative, the trial court should have awarded nominal damages].)

However, this is another argument Boyko is making for the first time on appeal and thus far too late in the day. " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with [their] theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950–951, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.) " ' "Where, as here, 'the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he [or she] must request *the additional or qualifying instruction in order to have the error reviewed.*' [Citations.]" [Citation.] [A party's] failure to request any different instructions means [they] may not argue on appeal the trial court should have instructed differently.' " (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1319, quoting *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.) While Boyko asserted multiple theories of recovery and secured instructions on all of them, she never asked for instructions on nominal damages or requested them in the special verdict form or prior to the discharge of the jury. She is not entitled to reversal to try a new claim she could have made but never did.

### Denial of New Trial on Damages

Boyko maintains she was entitled to a new trial on the ground of juror misconduct. Specifically, she claims jurors improperly concluded documentary proof was necessary to support her damages claim, improperly compared the evidence presented in the three separate cases being tried together, and incorrectly thought the judge would determine the amount of her damages if they did not.

" 'Courts evaluate a motion for a new trial based on jury misconduct in three steps: (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is misconduct, determine whether it was prejudicial.' " (*People v. Herrera* (2024) 102 Cal.App.5th 178, 195 (*Herrera*).)

The first step—determining whether the evidence supporting the motion for a new trial is admissible under Evidence Code section 1150—we review, "[l]ike any other issue of admissibility . . . for abuse of discretion." (*People v. Flores* (2021) 70 Cal.App.5th 100, 108.) "The moving party bears the burden of establishing juror misconduct." (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.) "We will not presume greater misconduct than the evidence shows." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.) The second step—determining whether the admissible evidence establishes misconduct—is " 'a legal question we review independently.' " (*Herrera, supra*, 102 Cal.App.5th at p. 195, quoting *People v. Collins* (2010) 49 Cal.4th 175, 242.) But in doing so, we " ' "accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 396.) The third step—whether prejudice arose from juror misconduct—is a mixed question of law and fact subject to an appellate court's independent determination. (*In re Carpenter*, at pp. 658–659.)

As to the first step, the trial court denied Boyko's new trial motion, stating an insufficient showing had been made to disrupt the jury's verdict. The court made no specific ruling on the evidentiary value of the juror affidavits. We therefore have no evidentiary ruling to review for abuse of discretion and must assume the trial court followed the law and made no ruling so arbitrary and capricious as to constitute an abuse of discretion.

24

(See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 455 [prejudice is not presumed in evidentiary context; it is appellant's burden to affirmatively demonstrate prejudice].)

As to the second step, Boyko advances three claims of juror misconduct. She first maintains the jury committed misconduct by "essentially creat[ing] its own jury instruction"—i.e., that she could only prove damages with documentary evidence. In this regard, she points to juror declarations stating jurors were uncomfortable relying on Boyko's testimony, alone, regarding the amount of her damages, even though the testimony was not challenged. They wanted to "see 'actual evidence,' " and " 'see the math,' " in support of her wage claims. But, as we have explained, these statements relate to the jury's deliberative process and are patently inadmissible under Evidence Code section 1150. In any case, given the other juror statements pertaining to juror confusion as to the bases for Boyko's damages claim and its seemingly speculative nature, that jurors may have wanted additional evidence was not tantamount to a self-made "jury instruction" requiring documentary and/or computational evidence. Rather, the jury apparently wanted additional evidence because it was not persuaded by Boyko's testimony—a consummate credibility finding entrusted to the jury.

Boyko's second claim of juror misconduct is related to her first and is predicated on juror statements that jurors compared Boyko's evidence on the amount of her claimed damages with that presented by Bogdan and Esfir. For example, one juror stated: "We discussed and compared the differences in the evidence provided in support of the three different plaintiffs' cases, and we agreed that without seeing invoices or other documentation of the type provided in support of Esfir and Bogdan Viner's cases, we did not [feel] comfortable providing a dollar amount for what we felt Ms. Boyko was owed."

25

Another juror declared: "We agreed that we felt much less certain about how to make a fair assessment of Ms. Boyko's hours and compensation rate in the absence of the same type of documentary evidence [such as that provided by Bogdan and Esfir], and we therefore did not provide a dollar amount for what we felt she was owed." According to Boyko, this violated the instruction that the jury should "decide the case brought by each plaintiff separately as if it were a separate lawsuit. Each plaintiff is entitled to separate consideration of each plaintiff's own claims." These juror statements are, again, inadmissible verbal reflections of the jurors' mental processes. (See *Hedgecock*, *supra*, 51 Cal.3d at p. 419.) And in any case, they do not support the conclusion the jury failed to consider Boyko's case separately. To the contrary, they as readily suggest—especially given that McMahon had died prior to trial and therefore was unable to contradict the testimony of any of the three plaintiffs—the jurors were looking for corroborating evidence as to *each* of the three plaintiffs. While Bogdan and Esfir presented such evidence, Boyko did not.

Boyko's third claim of misconduct is that the jury "abdicate[d]" its responsibility as the trier of fact by concluding, contrary to the law, that if they did not award damages to Boyko, the court would. In this regard she points to juror declarations stating or agreeing that "[t]he jury as a whole voiced agreement that if we were unable to come up with a dollar amount to compensate Ms. Boyko, then the judge would be able to do so after review of the case and evidence." Again, such statements cannot be used to impeach a jury verdict after-the-fact. As the court stated in *People v. Sanchez* (1998) 62 Cal.App.4th 460, "where, as here, the affidavit or declaration suggests ' " 'deliberative error' in the jury's collective mental process—confusion, misunderstanding, and *misinterpretation of the law*," ' particularly regarding

26

'the way in which the jury interpreted and applied the instructions,' the affidavit or declaration is inadmissible." (*Id.* at p. 476, italics added.) "The mere fact that such mental process was manifested in conversation between jurors during deliberations does not alter this rule." (*Ibid.*; accord, *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1682–1684 [declarations by several jurors stating that a majority of the jurors had relied on an erroneous definition of battery to reach its verdict held inadmissible under Evidence Code section 1150].)

In sum, these three claims of error as to the denial of Boyko's new trial motion fail on the second step as she presented no admissible evidence of juror misconduct. We therefore need not, and do not, consider the third step of the misconduct analysis as to these claims.

At several points in her briefing, Boyko also suggests the trial court should have granted a new trial because jurors felt rushed in their deliberations. Not only is this assertion based on inadmissible statements in the juror declarations, but even putting that aside, two jurors, including the foreman stated: "The jurors talked about feeling pressured by the compressed time frame of deliberations but were able to reach agreement and complete all of the verdict forms." Accordingly, whatever pressure some jurors may have felt—an issue we do not reach—was, in the end, not prejudicial as the jury was able to complete its charge to reach agreement and decide the cases.

### UCL Claim

Boyko maintains that in denying her UCL claim, the trial court usurped the jury's role by improperly impugning her credibility. Specifically, she contends the court's denial of her UCL claim conflicted with the jury's

finding she was owed wages and with three juror declarations stating the jurors found Boyko credible.

Boyko is correct that, "in a case involving both legal and equitable claims, findings made in connection with one set of claims are binding in a subsequent disposition of the other set of claims." (*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2019) 43 Cal.App.5th 988, 992; see *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 158 [allowing first fact finder's factual determination to bind the second "minimizes inconsistencies," "avoids giving one side two bites of the apple," and "prevents duplication of effort"].) It is also true that "UCL remedies are cumulative to remedies available under other laws ([Bus. & Prof. Code,] § 17205) and, as [Business and Professions Code] section 17203 indicates, have an independent purpose—deterrence of and restitution for unfair business practices." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179–180 (*Cortez*).)

However, while a court trying equitable claims after a jury trial is generally bound by the jury's findings, a court's discretion as to whether restitution should be awarded in this context is "very broad." (*Cortez, supra,* 23 Cal.4th at p. 180.) Business and Professions Code "[s]ection 17203 does not mandate restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court '*may* make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property.' [Citation.] That is, as our cases confirm, a grant of broad equitable power. A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute." (*Cortez,* at p. 180.)

As we have recited, the trial court found Boyko's testimony as to the *amount* of her damages—specifically her claim that she was entitled to be paid a 100 percent " 'pass-through' " rate (the amount billed to the clients for her time, without deduction for overhead or profit)—was not credible and was in conflict with her assertion that she was entitled to a 50/50 share of the business profits. It further found Boyko failed to prove the *amount* of wages owed to her as damages. In short, there is no conflict between the trial court's credibility assessment and finding, and the jury's findings. Both the court and the jury found Boyko's testimony insufficient to prove the *amount* of damages, if any, she was owed.

Even if we were to take into account the juror statements, which like all the other juror statements on which Boyko relies are inadmissible under Evidence Code section 1150, they do not conflict with the trial court's assessment of Boyko's UCL claim. As discussed above, while the jurors may have found Boyko generally credible, they also impliedly found her testimony regarding the amount of damages she was owed so contradictory and confusing they were unable to determine any amount. As the jury foreman stated in his declaration: "All of the jurors voiced their agreement that the dollar amount requested by Ms. Boyko's lawyers seemed speculative because there was no delineation of which of her duties the dollar amount applied."

Boyko lastly claims the trial court erred by failing to award her at least nominal restitution, pointing to the court's "personal opinion" she had received sufficient wages for the reasonable value of her work. However, in reaching its ruling denying her UCL claim, the court was *required* to consider the equities on both sides in deciding whether to make a restitution award—i.e., whether she had been harmed and McMahon unjustly enriched. These considerations included that: the jury was unable to find any specific

29

amount of damages owed; Boyko had received over $400,000 in lump sum payments from McMahon that were not tied to any specific work she performed in the 13 months at issue; her testimony with respect to what she was owed was contradictory and confusing; and McMahon was not available to confirm or contradict any of this contradictory and confusing testimony. In sum, Boyko has not established any improper action by the trial court in exercising its discretion under the UCL.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Langhorne Wilson, J.

A170449, Boyko v. McMahon

31